## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CLARION BRANDS, LLC** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **NO. 14-6592** |
| | : | |
| | : | |
| **LLORENS PHARMACEUTICAL** | : | |
| **INTERNATIONAL DIVISION, INC.., *et*** | : | |
| ***al.*** | : | |

**KEARNEY, J.**                                                                                           **June 5, 2018**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Trademark owners sue in federal court to ensure their trademarks are not used in deceptive or misleading ways under Congress's mandates in the Lanham Act. Our citizens properly rely upon us enforcing the Lanham Act through our judgment orders. We hold persons in civil contempt upon clear and convincing evidence of persons violating specific terms of our judgment orders including skirting our judgment order protecting trademarks.

But we cannot find contempt without clear and convincing evidence of violating our order. Suspecting misconduct, even when fueled by the alleged wrongdoer's incomplete or ambiguous explanations, is not enough. And we cannot transform conduct which may state another claim into civil contempt. Following briefing, oral argument, and evaluating credibility of witnesses and the 86 exhibits admitted at our evidentiary hearing, we cannot find the requisite clear and convincing evidence Defendants and non-parties violated our July 30, 2015 Consent Judgment enforcing the Plaintiff's rights under the Lanham Act. The challenged conduct may state a claim under state law but not for violating the terms of our July 30, 2015 Consent Judgment. We deny Plaintiff's Motion to enforce or for contempt in the accompanying Order.

# I.    Introduction

Clarion Brands, LLC ("Clarion") distributes over-the-counter dietary products including "Lipo-Flavonoid Plus" designed to enhance ear health and functionality. In November 2014, Clarion sued Llorens Pharmaceutical International Division, Inc. and Llorens Pharmaceutical Corp. (collectively "Llorens") alleging they infringed on Lipo-Flavonoid Plus by distributing and selling "Lipoflavovit," as a dietary supplement for ear health. Clarion sought to permanently enjoin Llorens from, *inter alia*, manufacturing, distributing, advertising, marketing, promoting, or selling its Lipoflavovit product. Clarion seeks relief under the Lanham Act; it is not complaining about theft of trade secrets or patent infringement.

Clarion and Llorens signed a Settlement Agreement on July 15, 2015 which included agreeing to a Consent Judgment and Permanent Injunction entered on July 30, 2015 ("Permanent Injunction"). The Permanent Injunction enjoined Llorens, Jose Llorens and Thusnelda Ruiz from manufacturing, selling, distributing, marketing, advertising, or promoting any dietary supplement designed to enhance inner ear health for a period of five years.

Nearly two years later, Clarion moved for leave to take discovery in aid of enforcing the Permanent Injunction. After discovery, Clarion moved to enforce the Permanent Injunction against Llorens, Mr. Llorens, and non-parties Alternative Pharmacal Corporation and Jose Hernandez under Federal Rules of Civil Procedure 70 and 71. Clarion contends Llorens, Mr. Llorens, Alternative Pharmacal, and Mr. Hernandez violated the Permanent Injunction in three specific ways: lying about remaining inventory of bottled and bulk Lipoflavovit product during the execution of the Permanent Injunction and receiving payments for at least a portion of the product after entry of the Permanent Injunction; "clandestinely" transferring Lipoflavovit

2

inventory stored in Puerto Rico to Llorens Puerto Rico sales representatives for later commercial use; and, by selling "Altiflav" through Alternative Pharmacal.

Arguing it has proven at least one of the three acts, Clarion asks we hold Llorens, Mr. Llorens, Alternative Pharmacal, and Mr. Hernandez in contempt of the Permanent Injunction and impose sanctions on them. Clarion cites specific facts to support its request for civil contempt including backdating of invoices to show disposition of Lipoflavovit before the date of the Settlement Agreement; sales of Altiflav by Mr. Hernandez while employed by Llorens Florida; Lipoflavovit and Altiflav are the same product; and, Llorens Florida, Llorens Puerto Rico, Alternative Pharmacal, and Advanced Generic Corporation, an entity owned by Mr. Hernandez and his wife Karen Llorens, all operate as one entity or are alter egos of each other. To further support its requests, Clarion asks we apply a spoliation inference for the alleged failure of Llorens, Alternative Pharmacal, and Mr. Hernandez to produce documents "explaining" the disposition of 5,190 bottles of Lipoflavovit Clarion contends Defendants sold or used instead of destroying it.

After considering the credibility of testimony and admitted exhibits, we find Clarion failed to present clear and convincing evidence of conduct violating the Permanent Injunction and deny Clarion's Motion in the accompanying Order.

## II.    Findings of Fact

1.    Clarion distributes over-the-counter dietary products including a dietary supplement called "Lipo-Flavonoid® Plus" designed to enhance ear health and functionality.[1]

2.    Clarion does not own patent rights or ownership interest in the chemical formulary for "Lipo-Flavonoid Plus."

3

3. Clarion is the assignee of the entire interest and goodwill in the Lipo-Flavonoid trademark. Clarion alleged its interest is continuing in the dual packaging and design through Sale Packaging and Use Packaging. Clarion's Lipo-Flavonoid product references "Ringing in the Ears?" with a semi-abstract drawing of a left-facing human ear with multiple curved line to the right of the ear to mimic sound waves.[2] The packaging also represented it is "The *only* product clinically proven to improve circulation in the inner ear" . . . under a "Unique Ear Health Formula."[3]

4. Clarion swears its Lipo-Flavonoid trademark is "well recognized by medical professionals, especially ear, nose and throat ('ENT') specialists and other participants in the ear health dietary supplement industry, including manufacturers, distributors and consumers."[4]

**A.   Relationship among the Defendants and non-parties.**

5. Llorens Pharmaceutical International Division, Inc. ("Llorens Florida") is a Florida corporation with its principal place of business in Miami, Florida.[5]

6. Llorens Pharmaceutical Corp. ("Llorens Puerto Rico") has a principal place of business in San Juan, Puerto Rico.[6]

7. Jose Llorens is the owner, President, and Chief Executive Officer of Llorens Florida and Llorens Puerto Rico.[7] Mr. Llorens testified at our evidentiary hearing. We find his testimony to be confusing at best but we cannot find he lacks credibility as to the disposition of Clarion's product in July 2015.

8. Thusnelda Ruiz, the wife of Mr. Llorens, is a co-owner of Llorens Florida and Llorens Puerto Rico.[8]

9. The 2017 annual report for Llorens Puerto Rico lists Mr. Llorens as President and Ms. Ruiz as Vice President.[9]

4

10. Annual reports filed for Llorens Florida identifies only Mr. Llorens and Ms. Ruiz as officers or directors.[10]

11. Llorens Puerto Rico began selling its "Lipoflavovit" product, marketed as a dietary supplement for inner ear health, in 2002 and Llorens Florida began selling Lipoflavovit in 2013.[11]

12. Llorens hired Nutri-Force Nutrition to manufacture the Lipoflavovit product.[12]

13. Non-party Jose Hernandez, the son-in-law of Jose Llorens, is currently the Vice President of Sales and Marketing for Llorens Florida.[13] Mr. Llorens became the Vice President of Sales and Vice President of Operations for Llorens Florida in 2015.[14]

14. As Llorens Florida's Vice President of Sales, Mr. Hernandez has authority to enter into sales contracts on its behalf.[15] In 2015, Mr. Hernandez's duties for Llorens Florida included managing Llorens Florida sales operations and online sales of Lipoflavovit in the United States. His responsibility for online sales included maintaining Llorens Florida's website and developing relationships between United States distributors.[16]

15. In a February 4, 2013 email, Mr. Hernandez asked Nutri-Force Nutrition if the language "Supports Ear Health" could be put on the front panel of the Lipoflavovit label.[17]

16. Mr. Hernandez has no ownership interest in Llorens Florida and does not participate in board meetings of either Llorens entity.[18]

17. Following an August – September 2010 Food and Drug Administration inspection of Llorens Florida, the FDA characterized Mr. Hernandez as "Director of Sales and Operations."[19]

18. In responses to discovery in this matter, Llorens Florida identified Mr. Hernandez as managing sales operations.[20]

5

19. Mr. Hernandez is the sole owner, President, Treasurer, Secretary, and Registered Agent of non-party Alternative Pharmacal Corp. which maintains its principal place of business at the same facility as Llorens Florida's principal place of business.[21]

20. Mr. Hernandez is the President of Advanced Generic Corp. which he co-owns with his wife, Karen Llorens, the daughter of Jose Llorens.[22] Advanced Generic is a private label distributor of generic over-the-counter drugs and dietary supplements.[23]

21. Alternative Pharmacal, among other activities, markets, sells, and distributes the dietary supplement "Altiflav."[24]

22. Llorens Florida maintains its principal place of business at a facility located in Miami, Florida (the "Facility"). Advanced Generic leases warehouse space from Llorens Florida, and both Advanced Generic and Alternative Pharmacal use warehouse space and employees of Llorens Florida at the Facility.[25]

23. Advanced Generic pays Llorens Florida $1,000 month in rent for use of the Facility, despite a lease agreeing to $2,000 a month in rent.[26]

24. Neither Alternative Pharmacal nor Advanced Generic share bank accounts with Mr. Llorens, Llorens Puerto Rico, or Llorens Florida.[27]

25. Mr. Llorens has no ownership interest in Alternative Pharmacal or Advanced Generic.[28]

**B.     Clarion sues and resolves the November 2014 infringement litigation and we enter a July 30, 2015 Consent Judgment and Permanent Injunction.**

26. In November 2014, Clarion sued Llorens Florida and Llorens Puerto Rico alleging trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. §1114; trade dress infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1125(A); false designation of origin and unfair competition under Section 43(A) of the Lanham Act, 15 U.S.C. § 1125(A);

6

and unfair competition under Pennsylvania law.[29] Clarion later added a claim for false advertising under Section 43(A) of the Lanham Act, 15 U.S.C. 1125(A).[30]

27.     Clarion alleged the Lipoflavovit product sold by Llorens infringed on Clarion's Lipo-Flavonoid Plus trademark and sought to permanently enjoin Llorens from, *inter alia*, manufacturing, distributing, advertising, marketing, promoting, or selling Lipoflavovit "using the challenged mark or trade dress or any other mark or trade dress that is confusingly similar to" Lipo-Flavonoid's mark and trade dress.[31]

28.     Clarion alleged, among other things, the packaging for the Llorens entities' Lipoflavovit included a "semi-abstract drawing of a left-facing human ear... with multiple curved lines to the right of the ear (to mimic sound waves)."[32]

29.     Clarion and the Llorens entities agreed to settle their dispute, entering into a Settlement Agreement effective July 15, 2015 and filing a joint motion for entry of stipulated judgment.[33]

30.     We entered the parties' stipulated Consent Judgment and Permanent Injunction on July 30, 2015.[34]

31.     Paragraph 3 of the Consent Judgment enjoins the Llorens entities, Jose Llorens, and Thusnelda Ruiz for a five-year period from "participating, in any manner, by themselves or in conjunction with any other person or entity, directly or indirectly, within the United States or elsewhere, in the manufacture, wholesale, distribution, marketing, advertisement, or promotion of any dietary supplement product designed to enhance or marketed as enhancing inner ear health, or from making any plans to do the foregoing."[35]

32.     We now decide whether the Defendants and non-parties with familial relationships violated the July 30, 2015 Consent Judgment.

7

### C. Llorens' disposition of its Lipoflavovit inventory as of July 30, 2015.

33.     On April 29, 2015, Llorens Florida placed an order with Nutri-Force Nutrition to manufacture Lipoflavovit.[36]

34.     On July 2, 2015, Nutri-Force Nutrition issued Llorens Florida a sales invoice for 5,190 bottles and 50,956 bulk tablets of Lipoflavovit.[37]

35.     On July 7, 2015, Mr. Llorens paid the July 2, 2015 Nutri-Force sales invoice with a check drawn on Llorens Puerto Rico's account.[38]

36.     At some undefined point in July 2015, Mr. Llorens told Mr. Hernandez of a settlement reached in Clarion's action against Llorens.[39]  Mr. Hernandez testified he knew of the settlement but did not know the terms of the Permanent Injunction until after Clarion moved to enforce it against him and Alternative Pharmacal in 2017.[40]

37.     Mr. Llorens told Mr. Hernandez Llorens will no longer sell Lipoflavovit.[41]  Mr. Llorens instructed Mr. Hernandez to put a notice on Llorens Florida's website announcing Lipoflavovit would no longer be sold.[42]

38.     At the time of Messrs. Llorens's and Hernandez's general conversation, 5,190 bottles of Lipoflavovit and 50,956 bulk Lipoflavovit tablets were "quarantined," also referred to by Mr. Llorens and Mr. Hernandez as "decommissioned," in the warehouse of Llorens Florida at Mr. Llorens's direction.[43]

39.     Mr. Hernandez's businesses, Advanced Generic and Alternative Pharmacal, share warehouse space in Llorens's Florida's Miami Facility.[44]

### *Mr. Hernandez testified he took the bottled and bulk Lipoflavovit for re-packaging and re-sale as Altiflav.*

40.     On July 10, 2015, Mr. Hernandez asked Llorens Florida employee Jose Perez about the status of the Lipoflavovit in the Llorens Florida warehouse.[45]  Mr. Perez told Mr.

8

Hernandez Lipoflavovit would be decommissioned or destroyed because Llorens Florida could no longer sell it.[46]

41. After learning the Lipoflavovit would be either decommissioned or destroyed, Mr. Hernandez took possession of the Lipoflavovit then in the Llorens Florida warehouse on July 10, 2015 and sent it to Lex Pharmaceutical for repackaging.[47]

42. Neither Mr. Hernandez nor Alternative Pharmacal paid Llorens for the decommissioned Lipoflavovit.[48]

43. On July 13, 2015, Mr. Hernandez sent an email to 21st Century Labels & Packaging requesting new labels for the decommissioned Lipoflavovit sent to Lex for repackaging. Mr. Hernandez originally intended the product to be sold by Advanced Generic as "Bioflavit."[49]

44. On July 27, 2015, three days before Clarion sought the entry of a Permanent Injunction, Mr. Hernandez decided to change the name of the product from "Bioflavit" to "Altiflav" and change the company marketing the product from Advanced Generic to Alternative Pharmacal.[50]

45. Sometime in August and September 2015, Lex Pharmaceutical repackaged the Lipoflavovit into bottles labelled "Altiflav" for sale by Alternative Pharmacal.[51]

46. Altiflav is a bioflavonoid, a type of fruit extract, with uses such as circulatory health, vertigo, cardiovascular activity, and varicose veins.[52] Bioflavonoids may also support ear health.[53] Both Lipoflavovit and Altiflav contain lemon bioflavonoid.[54]

47. Other bioflavonoid products were on the market from July 30, 2015 until Altiflav came onto the market in October 2015.[55]

9

48. The formulation of Lipoflavovit is identical to the formula of three other products sold by Llorens, including Trombonex and Trombonex D.[56]

49. Actiflovit, marketed by another entity, and Altiflav tablets are both red in color with no identifying mark.[57]

50. The parties generally agree the chemical formula for these products regardless of the seller is largely identical.[58]

51. Mr. Hernandez initially intended the Altiflav label to include "Compare to: Lipoflavovit Tabs."[59]

52. Mr. Hernandez then changed the label to omit "Compare to: Lipoflavovit Tabs" language and any reference to ear health.[60]

53. Nothing in the Altiflav label references ear health. The Altiflav label does not include a semi-abstract drawing of an ear of lines mimicking sound waves.

54. Mr. Hernandez ordered 3,000 additional bottles of Altiflav from Nutri-Force Nutrition in October 2016 using the identical formula as in Lipoflavovit.[61] Mr. Hernandez received the 3,000 bottles in July 2017 but has not sold any pending resolution of this action.[62]

### *Mr. Llorens's testimony regarding Lipoflavovit inventory at the time of the Settlement Agreement.*

55. Mr. Llorens testified he ordered Lipoflavovit bottles in the warehouses of Llorens Puerto Rico and Llorens Florida to be decommissioned or destroyed.[63] The Lipoflavovit inventory was never decommissioned despite Mr. Llorens's order to do so.[64]

56. Although he testified he ordered destruction of warehoused Lipoflavovit sometime in mid-July 2015, Mr. Llorens also testified the bottled Lipoflavovit in his warehouses were (a) given as samples to nine Llorens Puerto Rico sales representatives; (b) sold in part

10

(1,050 bottles) to Drogueria Betances pharmacy in Puerto Rico; and (c) sold the remaining inventory to other pharmacies in Puerto Rico around July 15, 2015.[65]

57.     As to the Lipoflavovit given to the nine Llorens Puerto Rico sales representatives, Mr. Llorens initially testified he did not know how many bottles were given to the sales representatives, but later in the hearing testified 300 sample packs of four pills to a pack were given to the nine Llorens sales representatives.[66]

58.     Invoices show Llorens Puerto Rico sales representatives' receipt of the samples reflecting a quantity of 338 Lipoflavovit "x100."[67]  Mr. Llorens later testified the nine Llorens Puerto Rico sales representatives each received 338 bottles of 100 pills.[68]

59.     The documentary evidence shows nine Llorens Puerto Rico sales representatives each received 338 bottles of Lipoflavovit containing 100 pills at no charge on July 15, 2015, totaling 3,042 bottles.[69]

60.     Declarations of eight of the nine Llorens Puerto Rico sales representatives all swear they received 338 bottles of Lipoflavovit on July 15, 2015, and did not receive any Lipoflavovit on or after July 30, 2015.[70]

61.     As to the Lipoflavovit product in 5,190 bottles and 50,956 bulk tablets from Nutri-Force Nutrition and acquired by Mr. Hernandez, Mr. Llorens testified the bottled Lipoflavovit went to Llorens Puerto Rico but the bulk Lipoflavovit remained in Florida.[71]

62.     Mr. Llorens testified the Lipoflavovit acquired by Mr. Hernandez came in bottles without labels and in bulk and is separate from the product sent to Puerto Rico to be given to Llorens Puerto Rico sales representatives and sold to pharmacies.[72]

11

63.     Mr. Llorens explained the Lipoflavovit from Nutri-Force Nutrition had not yet been delivered to him and he does not know what happened with the product from Nutri-Force because he ordered it decommissioned.[73]

64.     Mr. Llorens also testified the Lipoflavovit ordered from Nutri-Force Nutrition in April 2015 and received in July 2015 contained labeled and unlabeled bottles. Mr. Llorens shipped some of the Lipoflavovit to Puerto Rico, sold the bottles with labels, and quarantined the unlabeled bottles which remained in Florida and were not shipped to Puerto Rico.[74]

65.     A Llorens Florida packing slip dated July 8, 2015 shows shipment of 1,050 bottles of Lipoflavovit to Puerto Rico; 127 bottles with an expiration of December 31, 2017 and 923 bottles with an expiration of June 30, 2018.[75]

66.     The July 2, 2015 Nutri-Force Nutrition invoice reflects 50,956 bulk tablets of Lipoflavovit with a date of "6/18" in the line item, and 5,190 bottles of Lipoflavovit also with a date of "6/18."[76]

67.     Taking Hearing Exhibits 96 and 29 together, it is at least plausible 923 bottles of the 5,190 bottles of Lipoflavovit with an expiration date of June 30, 2018 were shipped to Puerto Rico, leaving 4,267 bottles of Lipoflavovit remaining at Llorens Florida. The 4,267 bottles plus 509 bottles derived from 50,956 bulk tablets (100 tablets to a bottle) amounts to 4,776 bottles remaining in Llorens Florida.[77]

68.     Mr. Llorens testified the 3,042 bottles shipped to the Llorens Puerto Rico sales representatives came from inventory already in storage.[78]

### *Clarion's allegations of backdated invoices to sales representatives.*

69.     Clarion contends on or after July 17, 2015, Mr. Llorens, through Llorens Puerto Rico, backdated the invoices to the nine Llorens Puerto Rico sales representatives.

12

70.     A July 10, 2015 Invoice Number 81898 reflects the sale of 1,050 bottles of Lipoflavovit from Llorens Puerto Rico to Drogueria Betances located in Puerto Rico.[79]

71.     The documentary evidence shows a group of invoices dated July 16, 2015 from Llorens Puerto Rico to various pharmacies in Puerto Rico reflecting sales (and what appears to be no charge) of Lipoflavovit bottles. The Invoice Numbers run in a numerical series from 81883 through 81890, and 81892.[80]

72.     The documentary evidence shows a group of invoices dated July 15, 2015 from Llorens Puerto Rico to the nine Llorens Puerto Rico sales representatives transferred 338 bottles of Lipoflavovit. The Invoice Numbers run from 81899 through 81907.[81]

73.     Clarion contends because the Invoice Numbers on the transfers to the sales representatives on July 15, 2015 are in a higher sequence than the Invoice Numbers on the sales invoices to pharmacies, Llorens backdated the invoices to the sales representatives. Clarion contends Llorens Puerto Rico transferred the 338 bottles of Lipoflavovit to its nine sales representatives, for a total of 3,042 bottles, for no charge sometime after July 17, 2015.

74.     Clarion contends these no-charge, paper transfers of Lipoflavovit were made to ensure Lipoflavovit remained on the market after the date of the *Settlement Agreement* and to ensure Lipoflavovit continued to be distributed to customers after Llorens left the ear health business.

75.     There is no evidence the Lipoflavovit transferred to Llorens Puerto Rico sales representatives were anything other than samples; that is, there is no evidence the sales representatives sold the product or Llorens received any revenue from the samples.

13

## III. Conclusions of Law

76.      Clarion contends there is clear and convincing evidence the Llorens entities and Mr. Llorens willfully violated the Permanent Injunction "by clandestinely continuing to distribute, market, and promote Lipoflavovit after the entry of the Permanent Injunction, and, also, in conjunction with Alternative Pharmacal Corporation and Jose Hernandez, by selling Altiflav, a product virtually indistinguishable from Lipoflavovit."[82]

77.      Clarion argues the Llorens entities and Mr. Llorens violated the Permanent Injunction in (a) lying about remaining inventory of both bulk and bottled Lipoflavovit during the execution of the Permanent Injunction, subsequently receiving payment for at least a portion of its Lipoflavovit inventory after the July 30, 2017, the entry date of the Permanent Injunction; (b) transferring a portion of the Lipoflavovit inventory in Puerto Rico to Llorens Puerto Rico sales representatives for subsequent commercial use; and (c) manufacturing, wholesaling, distributing, marketing, advertising, or promoting Altiflav, an ear health dietary supplement, through Llorens's agent and employee, Mr. Hernandez and his company Alternative Pharmacal.[83] Clarion asks we find Alternative Pharmacal the alter ego of Llorens.[84]

### A. Clarion's burden in proving a basis for civil contempt.[85]

78.      To hold the Llorens entities and Mr. Llorens in civil contempt of the Consent Judgment, we must find "(1) a valid court order existed, (2) the defendant had knowledge of the order, and (3) the defendant disobeyed the order."[86]

79.      Clarion must prove civil contempt by clear and convincing evidence, and we must resolve any ambiguities in favor of the party charged with contempt.[87]  "Evidence is 'clear and convincing' when it 'produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and

14

convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'"[88]

80. Our civil contempt power "is a potent weapon to be used with caution" and in our discretion.[89] "Although courts should hesitate to adjudge a defendant in contempt when 'there is ground to doubt the wrongfulness of the conduct,' an alleged contemnor's behavior need not be willful in order to contravene the applicable decree" and "good faith is not a defense in civil contempt."[90]

81. Clarion additionally seeks to hold non-parties Alternative Pharmacal and Mr. Hernandez in contempt of the Consent Judgment.

82. To frame these issues, we must focus on the issues in this case, and not trade secret or patent infringement rights. The issue is not whether the Defendants and non-parties sold the tablets held by the Llorens entities before July 30, 2015. The issue is not whether the Defendants breached some obligation to destroy their Lipoflavovit capsules. Nothing in our July 30, 2015 Order imposed these conditions.

83. Rather, today's decision focuses on whether the Defendants and non-parties violated our July 30, 2015 Consent Judgment in the context of this Lanham Act case. The Lanham Act is not a theft of trade secrets statute. Its purpose "requires no guesswork," as the Act itself identifies its intent is "[t]o regulate commerce . . . by making actionable the deceptive and misleading use of marks in such commerce; . . . to protect persons engaged in such commerce against unfair competition; [and] to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; . . .."[91]

15

**B. Clarion failed to prove by clear and convincing evidence Mr. Llorens or the Llorens entities violated the Consent Judgment.**

84.     Although Mr. Llorens' testimony is less than clear, we find no clear and convincing evidence Mr. Llorens or his Llorens entities violated the Consent Judgment after July 30, 2015.

85.     Clarion seeks to enforce the Permanent Injunction included in the July 30, 2015 Consent Judgment; this is *not* an action to enforce, or damages for a breach of, the parties' Settlement Agreement.

86.     There is no evidence Mr. Llorens or the Llorens entities "participat[ed], in any manner, by themselves or in conjunction with any other person or entity, directly or indirectly, within the United States or elsewhere, in the manufacture, wholesale, distribution, marketing, advertisement, or promotion" of Lipoflavovit or "any dietary supplement product designed to enhance or marketed as enhancing inner ear health" after July 30, 2015 in violation of paragraph 3 of the Permanent Injunction.

87.     The evidence shows all Lipoflavovit in the Llorens entities' possession transferred to Llorens Puerto Rico sales representatives, sold to other pharmacies in Puerto Rico, and taken by Mr. Hernandez for re-sale as Altiflav before July 30, 2015.

88.     Clarion asks us to find "legal title" to the bottled and bulk Lipoflavovit remained with Llorens Florida, including after Mr. Hernandez re-packaged it and sold it as Altiflav, because neither Mr. Hernandez nor Alternative Pharmacal paid Llorens Florida for the product.

89.     We are not aware of authority, and Clarion does not provide any, allowing us to find Llorens maintained "legal title" to a product because he did not consent or agree "to the transfer of legal title on behalf" of Llorens or because neither Mr. Hernandez nor Alternative Pharmacal took the product.

16

90. Even if we assume Llorens Florida had "legal title" to Lipoflavovit after Mr. Hernandez took it from the Facility and should be liable for its transfer by Mr. Hernandez and his company, we find no clear and convincing evidence any person manufactured, sold, distributed, marketed, advertised, or promoted "any dietary supplement product *designed to enhance or marketed as enhancing* inner ear health" after July 30, 2015.

91. We find no clear and convincing evidence of anyone *marketing* the packaged Altiflav as enhancing inner ear health after July 30, 2015.

92. The Altiflav packaging does not mention ear health and does not include semi-abstract drawings or an ear or sonic waves.

93. The Altiflav packaging mentions "dietary supplement" but no indication the supplement is designed to enhance or market inner ear health.

94. Clarion presumably approved the language of the Consent Judgment. It approved the modifier on dietary supplement product. We can only enforce the Consent Judgment as written.

95. We also find no clear and convincing evidence of backdating invoices to Llorens Puerto Rico sales representatives. While it is possible one could draw an inference of backdating based on the series of Invoice Numbers, there is no evidence meeting the clear and convincing standard; that is, "evidence so clear, direct and weighty and convincing as to enable" us as the fact finder "to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."

### C. Clarion failed to prove by clear and convincing evidence Mr. Hernandez or his companies violated the Consent Judgment.

96. Clarion seeks to hold Mr. Hernandez, as an officer or director of Llorens Florida, in contempt of the Consent Judgment. "A person who is not a party to a proceeding may be held

17

in contempt if he . . . has actual knowledge of a court's order and either abets the defendant or is legally identified with him."[92]

97.     Under Federal Rule of Civil Procedure 65(d)(2), an order granting an injunction binds only "(A) parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in active concert or participation with anyone described in Rule 64(d)(2)(A) or (B)" and "who receive actual notice of it by personal service or otherwise."[93]

98.     Clarion argues Mr. Hernandez is bound by the Consent Judgment because (a) Llorens Florida and Mr. Llorens were legally obligated to inform Llorens Florida officers and employees, including Mr. Hernandez, of the terms of the Permanent Injunction; (b) as an officer and employee of Llorens Florida, Mr. Hernandez is bound by the Permanent Injunction; and (c) Mr. Hernandez had actual or constructive knowledge of the Permanent Injunction.

99.     Clarion seeks to impute Mr. Hernandez's conduct to Llorens Florida and to Mr. Hernandez's companies, Advanced Generic and Alternative Pharmacal.

100.    Holding Mr. Hernandez bound by the Permanent Injunction, Clarion argues the Llorens Defendants violated the Permanent Injunction by making Lipoflavovit available in the market through samples to Llorens Puerto Rico sales representatives and by selling the Lipoflavovit inventory as Altiflav through Mr. Hernandez and Advanced Pharmacal.

101.    Clarion additionally argues Mr. Hernandez and Advanced Pharmacal violated the Permanent Injunction by selling Altiflav, an inner ear health dietary supplement, and aiding and abetting the Llorens Defendants in the sale of Altiflav.

18

*Even if Mr. Hernandez is bound by the Permanent Injunction, neither he nor Alternative Pharmacal violated the Permanent Injunction through Altiflav.*

102. Even if we find Mr. Hernandez bound by the Permanent Injunction through Clarion's various theories, he did not violate the Permanent Injunction through the sale of *Altiflav*.

103. Paragraph 3 of the Consent Judgment includes a Permanent Injunction enjoins the Llorens entities and Mr. Llorens for a five-year period from July 30, 2015 – the entry date of the Consent Order and Permanent Injunction – from manufacturing, selling, distributing, marketing, advertising, or promoting "any dietary supplement product *designed to enhance or marketed as enhancing* inner ear health."

104. Although Mr. Hernandez took the decommissioned Lipoflavovit and re-packaged it for sale as Altiflav, the Altiflav label is not marked for inner ear health. The bottle does not bear any label promoting Altiflav as enhancing inner ear health.

## D. Alternative Pharmacal is not the alter ego of the Llorens entities.[94]

105. Clarion seeks to impose liability on Alternative Pharmacal as the alter ego of Llorens Florida for conduct presumably occurring before July 30, 2015. Clarion asks us to find Alternative Pharmacal and Llorens Florida operated as one entity through the use of common equipment and employees at the Facility; the use of Llorens Florida's bottled and bulk Lipoflavovit from Nutri-Force Nutrition without Alternative Pharmacal paying Llorens Florida; the use of Llorens Florida's formulation for Lipoflavovit and vendor relationships for the second run of Altiflav; and, because the two entities do not operate at arms' length.

106. We cannot find clear and convincing evidence of Llorens Florida's violation of the Consent Judgment.

107.     Even if we arguably could find Llorens Florida violated the Consent Judgment, we find no basis for imposing liability on Alternative Pharmacal as its alter ego.

108.     The test for alter ego requires we determine "whether the company failed to observe corporate formalities, had functioning officers and directors, or kept corporate records, and whether the owner and the corporation comingled funds so that 'the corporation is merely a facade for the operations of the owner.'"[95]  "[T]o succeed on an alter ego theory of liability, plaintiffs must essentially demonstrate that in all aspects of the business, the two corporations actually functioned as a single entity and should be treated as such."[96]

109.     Clarion argues it need only prove alter ego by a preponderance of the evidence, citing *Plastipak Packaging, Inc. v. DePasquale*, a 2003 decision from our court of appeals.[97] There is a distinction in the standard of proof of alter ego under Pennsylvania law, which applies a preponderance of the evidence standard, versus federal common law, which applies a clear and convincing standard.[98]

110.     We need not determine which standard to apply because even applying a lesser standard, Clarion fails to prove alter ego by even a preponderance of the evidence.

111.     While Advanced Generic leases space from Llorens Florida, this does not meet the test for alter ego.  There is no evidence the Llorens entities and Mr. Hernandez's Alternative Pharmacal and Advanced Generic failed to observe corporate formalities, there is no evidence of commingled funds, and there is no evidence Alternative Pharmacal is "merely a façade" of the Llorens entities.

112.     Alternative Pharmacal is not an alter ego of Llorens Florida.

20

**E. There is no basis for an adverse inference based on alleged discovery abuses.**

113. Clarion initially sought a spoliation inference for the Llorens Defendants', Mr. Hernandez's, and Alternative Pharmacal's purported failure to produce documents explaining the disposition of 5,190 bottles of Lipoflavovit shipped to Puerto Rico; communications between Mr. Llorens and Mr. Hernandez; and copies of FDA inspection reports demonstrating Mr. Hernandez's "simultaneous management roles" for the Llorens entities and Alternative Pharmacal.[99]

114. In its post-hearing submission, Clarion takes a slightly narrower approach seeking an adverse inference against the Llorens Defendants, Alternative Pharmacal, and Mr. Hernandez for failing to participate in discovery.

115. Clarion contends the Llorens Defendants "provided no affirmative evidence accounting for the external disposition of the 3,042 bottles" of Lipoflavovit distributed to its nine sales representatives in Puerto Rico (388 bottles each to nine sales representatives).

116. Clarion asks we find Mr. Llorens's explanation he distributed all existing inventory of Lipoflavovit as samples to Llorens Puerto Rico sales representatives is not credible. Clarion contends to completely account for the disposition of 3,042 bottles of Lipoflavovit given to Llorens Puerto Rico sales representatives, we would have to assume physicians do not store or warehouse quantities of drugs or supplements and the nine sales representatives would have had to distribute the samples to approximately 250 physicians in only a few days assuming each physician accepted a dozen samples.

117. Clarion asks us to find the "absence of any evidence showing ultimate delivery destinations" of the 3,042 bottles transferred to Llorens Puerto Rico sales representatives,

permits us to draw an adverse inference "as to the Defendants' ultimate disposition" of the Lipoflavovit samples.

118. Spoliation occurs where (1) the evidence was in the party's control; (2) the evidence is relevant to the claims or defenses in the case; (3) there has been actual suppression or withholding of evidence; and (4) the duty to preserve the evidence was reasonably foreseeable to the party.[100] Clarion, as the party seeking spoliation sanctions, bears the burden of proving these elements.[101]

119. Spoliation sanctions "is usually referenced in instances where evidence has been altered or destroyed"[102] and "a finding of bad faith is pivotal to a spoliation determination."[103] An adverse inference for spoliation of evidence is an extreme remedy.[104]

120. There is no evidence from the Hearing, either through testimony or documents moved into evidence, to support a finding of actual suppression or withholding of evidence.

121. The only documentary evidence is Mr. Hernandez's declaration swearing he made a search for documents responsive to Clarion's discovery requests, produced all documents except for one withheld on the basis of privilege, and did not destroy any documents.[105]

122. We find no evidence of spoliation sufficient to impose an adverse inference.

**F.  There is no basis for sanctions against Clarion.**

123. Mr. Llorens's testimony is far from clear and his conduct giving rise to this action appears to blatantly violate the Lanham Act. We afforded little credibility to his testimony. Today's Order is based more on the admitted documents under Clarion's plead claims.

124. Given the ambiguity created, in part, by Mr. Llorens' responses and conduct during the lawsuit, Clarion appeared to present a good faith claim and certainly a colorable claim.

22

125.     There is no basis for sanctions against Clarion for pursuing this motion.

## IV.     Conclusion

Clarion failed to demonstrate by clear and convincing evidence Defendants or non-parties Alternative Pharmacal and Mr. Hernandez violated the Permanent Injunction. We deny its Motion to enforce the Consent Judgment in the accompanying Order. We also deny Defendants' request for sanctions.

---

[1] First Amended Complaint at ¶¶ 8-9 (ECF Doc. No. 40).

[2] *Id.* at ¶¶ 11-17.

[3] *Id.* at ¶ 17.

[4] *Id.* at ¶22.

[5] ECF Doc. No. 147 at ¶ 13.

[6] Hearing Exhibit ("Hearing Ex.") 9.

[7] ECF Doc. No. 147 at ¶ 9-10.

[8] *Id.* Although the Consent Judgment and Permanent Injunction added Ms. Ruiz as a defendant, Clarion does not seek contempt sanctions against her. *See* ECF Doc. No. 129-1 at 3, n.1. Both Mr. Llorens and Ms. Ruiz consented to the Court's personal jurisdiction. ECF Doc. No. 48 at ¶ 1.

[9] Hearing Ex. 9; April 12, 2018 Hearing Transcript ("Hearing Tr.") at 233.

[10] Hearing Tr. at 234.

[11] ECF Doc. No. 147 at ¶¶ 19-20.

[12] Hearing Tr. at 113-116. Nutri-Force Nutrition is not a party to this action.

[13] ECF Doc. No. 147 at ¶ 22.

[14] Hearing Tr. at 54-56.

[15] Hearing Tr. at 128, 241-242.

[16] Hearing Tr. at 74, 124, 127.

[17] Hearing Tr. at 79-80; Hearing Ex. 25.

[18] Hearing Tr. at 129-130.

[19] ECF Doc. No. 147 at ¶¶ 28, 36-39.

[20] *Id.* at ¶ 34.

[21] *Id.* at ¶¶ 11-13, 61-62.

[22] *Id.* at ¶¶ 48-49.

[23] Hearing Tr. at 110-111.

[24] ECF Doc. No. 147 at ¶ 78.

[25] *Id.* at ¶¶ 11-12, 62; Hearing Tr. at 62-63; Hearing Ex. 38.

[26] Hearing Tr. at 171-172.

[27] Hearing Tr. at 119.

[28] Hearing Tr. at 119.

[29] ECF Doc. No. 1.

[30] ECF Doc. No. 40.

[31] *Id.* at Prayer for Relief.

[32] *Id*. at ¶ 37.

[33] ECF Doc. No. 47.

[34] ECF Doc. No. 48.

[35] *Id.* at ¶ 3.

[36] Hearing Ex. 28.

[37] ECF Doc. No. 147 at ¶¶ 99-100; Hearing Ex. 28.

[38] Hearing Ex. 28.

[39] Hearing Tr. at 85-86.

[40] Hearing Ex. 90 at ¶¶ 17, 19; Hearing Tr. at 51-52; 131-132.

[41] Hearing Tr. at 85-86.

[42] Hearing Tr. at 94.

[43] Hearing Tr. at 91-93, 97, 197-99, 209, 248, 257-58.

[44] Hearing Tr. at 86.

[45] Hearing Tr. at 87.

[46] Hearing Tr. at 91-92.

[47] Hearing Tr. at 87-88.

[48] Hearing Ex. 90 at ¶ 28.

[49] Hearing Ex. 100; Hearing Tr. at 158.

[50] Hearing Tr. at 156.

[51] Hearing Tr. at 87-88.

[52] Hearing Tr. at. 143-144.

[53] Hearing Tr. at 154.

[54] Hearing Tr. at 155.

[55] Hearing Tr. at 160.

[56] Hearing Tr. at 181, 198, 248.

[57] Hearing Exs. 98. 99; Hearing Tr. at 141-142.

[58] Clarion contends Altiflav and Lipoflavovit are chemically and compositionally identical products made with the exact formula by Nutri-Force. Mr. Hernandez agrees and admitted the formula used for the second run of Altiflav is the identical formula used in Lipoflavovit. Hearing Tr. at p. 100. Mr. Llorens does not agree, instead proposing we find the bioflavonoid product

Altiflav is *not* Lipoflavovit. ECF Doc. No. 160 at ¶ 49. We discount Mr. Llorens's knowledge of Altiflav as he claims to have no knowledge of Mr. Hernandez's sale of Altiflav.

[59] Hearing Ex. 100.

[60] Hearing Ex. 98; Hearing Tr. at 80-81.

[61] Hearing Tr. at 100.

[62] Hearing Tr. at 100.

[63] Hearing Tr. at 199-200.

[64] Hearing Tr. at 198.

[65] Hearing Tr. at 200, 208-209; Hearing Exs. 33B, 39, 40.

[66] Hearing Tr. at 200-203.

[67] Hearing Ex. 33.

[68] Hearing Tr. at 207-208.

[69] Hearing Ex. 33; Hearing Tr. at 203-208.

[70] Hearing Exs. 77-84.

[71] Hearing Tr. at 193-195.

[72] Hearing Tr. at 209.

[73] Hearing Tr. at 209-210.

[74] Hearing Tr. at 257-258.

[75] Hearing Ex. 96; Hearing Tr. at 259-261.

[76] Hearing Ex. 28.

[77] Hearing Tr. at 263-264.

[78] Hearing Tr. at 264.

[79] Hearing Exs. 33B, 39.

[80] Hearing Ex. 40.

[81] Hearing Ex. 33.

[82] Renewed Motion to Enforce the Consent Judgment at ¶ 1 (ECF Doc. No. 129).

[83] ECF Doc. No. 129 at ¶ 3.

[84] ECF Doc. No. 129 at ¶ 4.

[85] The parties and non-parties cite Pennsylvania law on civil contempt.

[86] *Harris v. City of Phila.*, 47 F.3d 1311, 1326 (3d Cir. 1995) (citing *Roe v. Operation Rescue*, 919 F.2d 857, 871 (3d Cir. 1990)).

[87] *U.S. v. Chabot*, 681 F.App'x 134, 136 (3d Cir. 2017); *Harris*, 47 F.3d at 1321, 1326 (citations omitted).

[88] *Jones v. Brown*, 425 F.App'x 93, 96 (3d Cir. 2011) (citation omitted); *U.S. v. Baker Funeral Home, Ltd.*, 196 F.Supp. 3d 530, 549 (E.D. Pa. 2016) (quoting *U.S. v. Askari*, 222 F.App'x 115, 119 (3d Cir. 2007)).

[89] *Cottman Transmission Sys., Inc. v. Melody*, 841 F.Supp. 675, 677 (E.D. Pa. 1994).

[90] *F.T.C. v. Lane Labs-USA, Inc.*, 624 F.3d 575, 582 (3d Cir. 2010) (internal citations omitted).

[91] *Lexmark Intern., Inc. v. Static Control Components, Inc.*, --- U.S. ---, 134 S.Ct. 1377, 1389, 188 L.Ed.2d 392 (2014) (quoting 15 U.S.C. § 1127).

[92] *Roe*, 919 F.2d at 871 (quoting *Quinter v. Volkswagen of Am.*, 676 F.2d 969, 972 (3d Cir. 1982)).

[93] Fed.R.Civ.P. 65(d)(2).

[94] The parties and non-parties cite alter ego law defined by our court of appeals.

[95] *Smith v. Carolina Med. Ctr.*, 274 F.Supp.3d 300 (E.D.Pa. 2017) (quoting *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484-85 (3d Cir. 2001)).

[96] *Pearson*, 247 F.3d at 485.

[97] 75 F.App'x 89, 90 (3d Cir. 2009).

[98] *See Clientron Corp. v. Devon IT, Inc.*, 154 F.Supp.3d 132 (E.D. Pa. 2015). In *Clientron*, Judge Baylson noted the "somewhat muddled" case law on the burden of proof for piercing the

corporate veil. *Id.* at 138 n. 6 (collecting cases). Judge Baylson, sitting in diversity, applied Pennsylvania law. Recent cases from our sister districts, and this district, apply a clear and convincing standard in cases based on federal question jurisdiction. *See e.g. N.J. Bldg. Laborers' Statewide Pension Fund and Trs. v. Richard A. Pulaski Construction,* No. 14-4919, 2018 WL 2289878, at *1 (D.N.J. May 18, 2018) (citing *Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk,* 332 F.3d 188, 197 (3d Cir. 2003); *CMC GH Sisak D.O.O. v. PTC Grp. Holdings Corp.,* No. 15-1357, 2016 WL 5025750, *2 (W.D. Pa. Sept. 20, 2016) (citing *Lutyk,* 332 F.3d at 194); and *U.S. v. Baker Funeral Home, Ltd.,* 196 F.Supp. 3d 530, 538 (E.D. Pa. 2016). In *Baker Funeral Home,* Judge Robreno referred to an earlier stage of the litigation applying clear and convincing standard in finding Baker Funeral Home, PC a successor to Baker Funeral Home, Ltd. in granting the United States' motion for contempt on a permanent injunction.

[99] ECF Doc. No. 129-1 at 9.

[100] *Bull v. United Parcel Serv., Inc.,* 665 F.3d 68, 73 (3d Cir. 2012) (citing *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 334 (3d Cir. 1995)).

[101] *Davis v. Quaker Valley Sch. Dist.,* No. 13-1329, 2016 WL 912297, at *9 (W.D. Pa. Mar. 10, 2016) (citing *Flanders v. Dzugan,* No. 12-1481, 2015 WL 5022734, at *4 (W.D. Pa. Aug. 24, 2015)).

[102] *Id.* (citing *Micron Tech, Inc. v. Rambus Inc.,* 645 F.3d 1311, 1320 (Fed. Cir. 2011)).

[103] *Id.* at 79.

[104] *Accurso v. Infra-Red Servs., Inc.,* 169 F.Supp. 3d 612, 618-19 (E.D. Pa. 2016) (denying an adverse inference for alleged spoliation of electronically stored information under Fed.R.Civ.P. 37(e)).

[105] Hearing Ex. 90 at ¶¶ 44-58.